UNITED STATES, Appellee,

v.

Jason J. SANCHEZ, Lance Corporal,
U.S. Marine Corps, Appellant.

No. 98–0635.
Crim.App. No. 96–1020.

U.S. Court of Appeals for
the Armed Forces.

Argued Dec. 17, 1998.

Decided July 30, 1999.

COX, C.J., delivered the opinion of the Court, in which SULLIVAN, CRAWFORD, GIERKE, and EFFRON, JJ., joined.

For Appellant: *Lieutenant Robert Attanasio*, JAGC, USNR (argued); *Major Albert Diaz*, USMCR (on brief).

For Appellee: *Major M.K. Jamison*, USMC (argued); *Colonel K.M. Sandkuhler*, USMC, and *Commander D.H. Myers*, JAGC, USN (on brief); *Lieutenant Russell J.E. Verby*, JAGC, USNR.

Chief Judge COX delivered the opinion of the Court.

In accordance with his plea, appellant was convicted at a general court-martial of one specification of misprision of a serious offense, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was sentenced to a bad-conduct discharge, 24 months' confinement, total forfeitures, and reduction to the pay grade of E–1. Pursuant to the terms of a pretrial agreement, all confinement in excess of 12 months was suspended for a period of 12 months.

Appellant asks us to set aside his conviction for two reasons. First, he asserts that his conviction for misprision of a serious offense violated his Fifth Amendment right against self-incrimination. Second, he asserts his plea was improvident because the authorities had immediate knowledge of the offense, and thus appellant merely concealed the identity of the assailant, which he claims does not fall within the defined offense. *See* 50 MJ 206 (1998).

### FACTS

While stationed in Okinawa, appellant and two of his friends, Lance Corporals Trosper and Davis, went out one evening to the First Chance Saloon. While at this bar, they met a Seaman Apprentice Simoneau, a Navy sailor also out on liberty. They observed Simoneau open his wallet to pay for some T-shirts at a gift shop at the bar and noticed that he had a large amount of cash.

Trosper remarked that Simoneau "should be taught a lesson [about] ... waiving his money around." After appellant finished a pool game, all three Marines decided to leave to visit another bar. While on their way to the other bar, they all saw Simoneau again and began talking with him. All four traveled from bar to bar until they wound up at what appellant described as a purported "whore house."

Appellant and Trosper went up to the door of the house to knock while Simoneau and Davis stood in a corner of the parking lot. Appellant and Trosper received no answer at the door and decided to take the time to urinate against the wall. While urinating, appellant heard someone yell, "Take my money, take my money. It's in my pocket." At that point, appellant ran over to Davis and Simoneau and saw Davis on top of Simoneau. At that time, appellant thought that Davis was punching Simoneau. As he ran closer to both men, appellant realized that Davis was actually stabbing Simoneau with a small blade, about 2–2½ inches long—the type that would be attached to a key chain. Appellant yelled at Davis not to "stab him," in an attempt to get Davis to throw the knife down. Davis did not drop the knife, and appellant shook him and eventually pulled

him away from Simoneau. Appellant and his two friends then fled the scene, leaving Simoneau alone, lying injured.

The three men then attempted to return to the First Chance Saloon but saw that people had begun to come out in an apparent attempt to look for the perpetrators. They then decided to hail a cab to escape the area as quickly as possible, without being detected.

Appellant knew a barracks that they could all stay at for the night on Kadena Air Base, instead of returning to their base at Schwab, because the Marines thought that someone might have been looking for them at Schwab. They formulated a plan to ride back in government transportation with some Marines who had duty in the area the next day.

That night, all three men agreed that they would not report the crime and that the knife would have to be "thrown away." After they returned undetected to their unit, all agreed that appellant should wear long-sleeved shirts during the rest of his time in Okinawa because he had easily identifiable tattoos that someone might notice. Appellant, in fact, did wear long-sleeved flannel shirts during off-duty hours for as much time as he could tolerate doing so. It was hot in Okinawa during September and October when appellant was wearing these shirts.

At the end of October 1995, appellant was permanently returning to the United States from Okinawa and was stopped by a security policeman. The policeman detained him because he had seen one of appellant's distinctive tattoos—a spider web on his right elbow. Appellant was then held for questioning and confessed to his involvement in the offense, as well as identifying the two other Marines who were with him the evening that Simoneau was assaulted. Appellant's reason for not originally reporting the crime was because he did not want Davis to be detained in Okinawa on legal hold because Davis's daughter had just been born in the United States. Appellant wanted to give him a "second chance."

## DISCUSSION

We first consider appellant's argument that his conviction violated his Fifth Amendment right against self-incrimination. He alleges that requiring him to report the crime would require him to implicate himself as an accessory after the fact to the aggravated assault.

We reject this argument as lacking merit under the facts of this case. Appellant could have reported this offense immediately without incurring criminal liability. His criminal actions came after his opportunity to report the offense first arose. If appellant had acted at that time, the authorities would have been able to solve the crime 1½ months sooner than they did, and the victim would have received faster medical attention. Although the victim managed to self-report the crime and seek attention on his own, he would have been spared the risk of further injury or death if appellant had sought assistance immediately. Appellant would have incurred no personal, legal risk at that time.

Moreover, appellant pleaded guilty to the misprision charge. A guilty plea waives most legal challenges against a conviction, unless preserved by conditional pleas. *See* RCM 910, Manual for Courts–Martial, United States (1995 ed.). Additionally, at least one federal court has held that a guilty plea waives a defendant's defense that his Fifth Amendment rights have been violated by a prosecution for misprision. *See United States v. Davila*, 698 F.2d 715, 719 (5th Cir. 1983). There was no conditional plea in this case. Thus, appellant's argument not only lacks merit under the specific facts of this case, but he waived any complaint by his guilty plea.

We also reject appellant's second argument that his guilty plea was improvident. Appellant argues that merely not reporting this offense does not rise to the level of misprision because his only action was not reporting an offense of which the authorities were already aware. He urges this Court to hold the only act that constitutes misprision is concealing the offense. We disagree.

The Manual for Courts–Martial explains the "concealment" portion of the offense as follows:

A mere failure or refusal to disclose the serious offense without some positive act of concealment does not make one guilty of this offense. Making a false entry in an account book for the purpose of concealing a theft committed by another is an example of a positive act of concealment.

Para. 95(c)(3), Part IV.

Appellant took affirmative steps to conceal the identity of the offender after commission of this offense. First, appellant discussed disposal of any evidence that might link Davis to the crime, especially the knife that was used in the attack. Appellant suggested that the three Marines stay the night of the offense at Kadena Air Force Base to avoid detection and helped formulate a plan to secure transportation back to Schwab, where the three were stationed. Appellant also agreed to wear long-sleeved flannel shirts during hot weather in order to conceal his identifiable tattoos. During his plea, appellant agreed that all of these actions were affirmative steps to conceal the assault and were also prejudicial to good order and discipline in the armed forces. In all, these actions clearly amount to affirmative assistance supportive of a misprision conviction.

The gravamen of misprision is concealment. We are unpersuaded that concealing the identity of the offender is any different than concealing the detection of the offense. Both acts of affirmative concealment are equally and criminally culpable. The facts admitted by appellant are sufficient to support his guilty plea to misprision. There is nothing in the record inconsistent with his plea, and thus, there is no "substantial basis" on which to disturb appellant's conviction. *See United States v. Prater*, 32 MJ 433, 437 (CMA 1991).

The decision of the United States Navy–Marine Corps Court of Criminal Appeals is affirmed.